(C.D. 2270)

GEORGE A. ABOOD CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 26, 1961)

*Sharretts, Paley & Carter* (*Howard Clare Carter* of counsel) for the plaintiff.
*William H. Orrick, Jr.*, Assistant Attorney General (*Murray Sklaroff*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise involved in the case at bar, described as "Brifisol 410 Sodiumphosphate," was classified for duty

(1)

at the rate of 11½ per centum ad valorem under paragraph 5 of the Tariff Act of 1930, as modified by the Sixth Protocol to the General Agreement on Tariffs and Trade, T.D. 45108, as a chemical compound, not specially provided for. The product under consideration is covered by entry No. 934516 herein, the protest being abandoned as to merchandise covered by another entry (No. 966948). Plaintiff claims the importation in question properly classifiable at the rate of one-half of 1 cent per pound under paragraph 81 of said act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, as sodium phosphate (except pyrophosphate), containing by weight less than 45 per centum of water. The product is used principally as a preservative for meat and is a constituent in the manufacture of detergents (R. 4).

Plaintiff called as its first witness Fritz Ruf, employed by Joh. A. Benckiser, Ludwigshafen am Rhein, West Germany, the manufacturer of the involved merchandise, as a food chemist and assistant to the chief chemist. Mr. Ruf is in charge of the control of all of the company's products, such as phosphates, citric acid, and tartaric acid and their salts. The witness has an excellent academic background in his field and does extensive research in developing new chemical products.

There was received in evidence a representative sample of the imported merchandise (plaintiff's exhibit 1), stated to have been produced under the control of plaintiff's witness, its chemical formula being given as $Na_6P_4O_{13}$. Mr. Ruf testified that the material "is a sodium phosphate" (R. 24) and that the materials used in its manufacture are phosphoric acid and soda ash.

Mr. Ruf further testified that he had analyzed merchandise like plaintiff's exhibit 1 and determined its chemical properties. He stated that "It has a pH from 8.4, and a content of 60.4," which represents the $P_2O_5$ in the product, which "is the control for us, because every phosphate is determined through a content of $P_2O_5$" (R. 30). The witness explained that "Sodium phosphate is a name for any sodium phosphate of any phosphoric acids"; that there are orthophosphoric acids, pyrophosphoric acids, polyphosphoric acids, and metaphosphoric acids (R. 32); that pyrophosphoric acids are distinguished by the fact that there are two phosphorus atoms in the molecule; and that pyrophosphoric acids differ from metaphosphoric acids, having different empirical formulas and different structural formulas. He stated that the imported product is not a pyrophosphate, because "it is not one of the four possible salts of pyrophosphoric acid," and concluded that it is a sodium salt of the tetra-polyphosphoric acid and is called sodium hexametaphosphate (R. 35), containing only 0.2 to 0.3 per centum water by weight.

On cross-examination, Mr. Ruf testified that plaintiff's exhibit 1 is made from "normal ortho-phosphoric acid" having a formula of "$H_3PO_4$," a liquid, which is combined with soda ash and then melted or fused in an oven by a secret process. The witness further stated that while there is actually no $P_2O_5$ (phosphoric pentoxide) in plaintiff's exhibit 1, all phosphates are defined or identified through their content of $P_2O_5$ by calculation and that the material was called sodium hexametaphosphate "Because it was practical to use this name" for this type of glassy phosphate (R. 40). He further stated that when soda ash is first mixed with phosphoric acid, a chemical reaction takes place in which the carbonate goes out, resulting in the production of salts of phosphoric acid known as "mono and disodium phosphate," which may both be present in the mixture at the same time. After the application of heat to the mixture, there is a condensation, that is, a binding between the phosphorus of the orthophosphates, with the removal of the water content, resulting in condensed phosphates, a so-called "POP" or phosphorus-oxygen-phosphorus bridge bonding (R. 43).

Herbert W. Eckweiler, a consulting chemist and, until his retirement in 1956, a chemist employed in the United States Customs Laboratory at New York, testified that he is a graduate of Brooklyn Polytechnic Institute with the degree of bachelor of science in chemistry. Since 1956, Mr. Eckweiler has been retained and consulted by a number of trade associations engaged in the chemical field. He is a member of the American Chemical Society and the American Association of Textile Chemists and Colorists.

Mr. Eckweiler testified that, in the course of his prior employment, he had made a study of sodium phosphates; that the term "sodium phosphate" refers to any one of a number of salts of various phosphoric acids; that the term "sodium pyro phosphate" refers to one of the salts of pyrophosphoric acid. Based on the description of the process of manufacture heretofore described, plaintiff's witness testified that plaintiff's exhibit 1 is a sodium phosphate—because "it contains the sodium, and the phosphorus, and the oxygen, which is characteristic of sodium phosphate. The phosphorus is there in the structure, and linkages, which are characteristic of poly phosphates" (R. 46–48). Mr. Eckweiler also testified that plaintiff's exhibit 1 is not a sodium pyrophosphate because it is not one of the four known salts of pyrophosphoric acid (R. 48–50).

On cross-examination, Mr. Eckweiler admitted that he had not analyzed the imported material. He stated that polyphosphates are characterized by the fact that they have a chain structure as a general rule, although the metaphosphates have a ring structure; that "pyro" phosphates are part of the group of polyphosphates (R. 52) and would have the same characteristics as other polyphosphates, but "Only with

respect to the fact that their chains were phosphorus and oxygen and phosphorus" (R. 53); that pyrophosphates are dipoly phosphates while the other polyphosphates may be tripolyphosphates, on up to octapolyphosphates and even higher. The witness concluded by stating that monosodium, disodium, and trisodium phosphates are not of the group "poly phosphates."

It was stipulated between counsel for the respective parties that a seller in the American market would not be able to fill an order for sodium phosphate unless the particular sodium phosphate was specified and that the purchaser would always specify the particular sodium phosphate desired (R. 55–56).

Dr. John R. Van Wazer, presently employed as assistant director of research and senior scientist of the Inorganic Chemical Division of Monsanto Chemical Co., St. Louis, Mo., testified for the defendant. He holds a bachelor of science degree, with a chemistry major, from Northwestern University, granted in 1940. He was awarded a master's degree in 1941, and a doctor's degree in 1942 from Harvard University in the field of physical chemistry. Dr. Van Wazer has previously been employed by Eastman Kodak Co. as a physical chemist, by the Manhattan Project at Oakridge, Tenn., by the Rumford Chemical Works, Rumford, R.I., and also by the Great Lakes Carbon Corp., Chicago, Ill. It appears that Dr. Van Wazer had been engaged in the field of phosphates since 1947. He is a member of a number of chemical and scientific societies and is the author of over 60 scientific and technical articles, as well as articles on phosphorus and phosphates in several chemical publications (R. 69–72).

Dr. Van Wazer testified that, in his present capacity, he is in charge of all research and commercial development dealing with phosphates for Monsanto Chemical Co., including work in connection with the new processes and new products, technical service for customers, as well as dealing with foreign producers of sodium phosphates on a technical basis, such employment covering the entire field of phosphate chemistry, both practical and theoretical (R. 73). Dr. Van Wazer, who it appears had analyzed a portion of plaintiff's exhibit 1, testified that he first made a qualitative two-dimensional paper "chromatographic" study of the sample by placing a drop of a solution of the sample on a corner of a sheet of filter paper and then allowing a special solvent to slowly diffuse up into the paper. "The low molecular weight phosphates will move quite fast. As the solvent moves up, they will move behind the solvent, not as fast as the solvent front, and at the same time, the higher molecular weight phosphates will move up more slowly. If they are very high molecular weight, they will not move at all." The filter paper is then dried and another special solvent is allowed up in the opposite direction, and this then

divides the phosphates into chain species and into ring species, thus determining whether the phosphate has a chain or a ring structure (R. 74–75). The witness further testified that he had also performed an ion exchange analysis on the merchandise at bar, which confirmed the quantitative paper chromatographic results, which showed that 53.3 per centum of the total phosphorus pentoxide was present as tripolyphosphate, 35.1 per centum of the phosphorus was present as tetrametaphosphate, 10.1 per centum of the phosphorus was present in the form of pyrophosphate, and less than 1 per centum each of ortho-phosphate and trimetaphosphate (defendant's exhibit B) (R. 84). A further so-called classical method analysis, in which the pH content or degree of acidity or alkalinity of a 1 per centum solution of the material was determined, established that the total "$P_2O_5$," a measure of the amount of phosphorus in the sample, was 61.65, which determination, the witness stated, was consistent with the ion exchange data (R. 85–86). Upon the basis of the tests performed, the sample was over one-half sodium tripolyphosphate, roughly one-third solution tetrametaphosphate, stated to be a relatively rare sodium phosphate, and about 10 per centum of the sample was present as tetrasodium phosphate (R. 87–88). In the opinion of the witness, the sample which he analyzed was not sodium hexametaphosphate, a "glassy" phosphate, and plaintiff's exhibit 1 could not possibly be a glassy sodium phosphate because "The tetrametaphosphate anion is unstable in the melt, and a glass is a chill melt" (R. 89–90).

Dr. Van Wazer further testified that the sample of the imported merchandise is a mixture of predominantly sodium tripolyphosphate, sodium tetrametaphosphate, and sodium pyrophosphate; that the term "sodium phosphate" is generally used by chemists to mean sodium orthophosphate; that the only phosphates known to commerce in 1930 were the orthophosphates, "which were just called phosphates," and the pyrophosphates, the latter being the first commercial example of a "chain" or condensed phosphate, but that during the last 15 years with the introduction into commerce of additional phosphates, "you can always use the term 'sodium phosphate' as a generic term to include the entire family" from the orthophosphates to the tripolyphosphates, etc. (R. 91–92).

On cross-examination, Dr. Van Wazer testified that sodium hexa-metaphosphate is included in the term "sodium phosphates," as that term is commonly used, but that, from the point of view of an industrial phosphate chemist, "someone who works with customers," sodium hexametaphosphate is not embraced within the term "sodium phosphate."

Essentially, the question in the case at bar is whether the imported product is properly classifiable under the provisions of paragraph 81

of the Tariff Act of 1930, as modified, as "Sodium phosphate (except pyro phosphate) : Containing by weight under 45% of water." In our disposition of the issue herein, we are of opinion that the product in question is not sodium pyrophosphate. The record in the case at bar as established by the uncontradicted testimony of plaintiff's witnesses, shows that sodium pyrophosphate is one of the four possible salts of pyrophosphoric acid (R. 33, 35, 48, 50). As disclosed in the record, the merchandise at bar is the sodium salt of phosphoric acid other than pyrophosphoric acid (R. 42). Accordingly, it is a sodium phosphate other than sodium pyrophosphate. The record further indicates that pyrophosphoric acids have a different empirical formula and a different structural formula from other phosphoric acids (R. 34).

One of the contentions of the defendant is that the legislative history of paragraph 81 of the Tariff Act of 1930 indicates that Congress did not intend merchandise such as that at bar to be provided for under said paragraph. Reference to some of the legislative background, as hereinafter disclosed, appears pertinent.

In the Summary of Tariff Information, 1929, on the Tariff Act of 1922, under the heading "sodium phosphate," at page 390, we find:

Description and uses.—Three kinds of sodium phosphate are known in commerce—monosodium, disodium, and trisodium phosphate—all made from the same raw material, phosphoric acid, and each having its distinct uses. * * *

At the time the Tariff Act of 1930 was under consideration, a brief was filed at the Hearings before the Committee on Ways and Means, House of Representatives, 70th Congress, 2d session (Tariff Readjustment, 1929, volume 1, schedule 1, page 869), by Curie, Lane & Wallace, New York City, representing German manufacturers of sodium phosphate in opposition to a request by domestic manufacturers of sodium phosphate to increase the duty on sodium phosphate from one-half of 1 cent per pound (provided for in paragraph 83 of the Tariff Act of 1922) to 1 cent per pound. The following appears therein:

This brief in opposition to an increase in the rate of duty is based partly upon findings of the Tariff Commission and the testimony submitted to that commission and also upon the testimony and briefs submitted by the domestic interests as set out in pages 606 to 613 of the committee print—hearings before the Committee on Ways and Means—Schedule 1.

The preliminary statement of the United States Tariff Commission *divides* sodium phosphate *into three groups: Monosodium phosphate, disodium phosphate* and *trisodium phosphate.* * * * [Italics ours.]

At the same tariff hearings above referred to, a brief of Warner Chemical Co. and Victor Chemical Works was presented to the Ways and Means Committee, House of Representatives (Hearing before the Committee on Ways and Means, House of Representatives, Seventieth

Congress, Second Session—Tariff Readjustment—1929, volume 1, schedule 1), page 867, in which the following was stated:

The Warner Chemical Co. of New York City and the Victor Chemical Works of Chicago, Ill., respectfully call attention to the brief filed on sodium phosphate on behalf of various manufacturers, * * * and request that in describing sodium phosphate in the new act, there be inserted the phrase "excepting pyro phosphates." We request that the provision with respect to sodium phosphate be changed to read as follows:

PAR. 83. Sodium * * * phosphate (excepting pyro phosphates) containing less than 45 per cent of water, 2 cents per pound; * * *

The phosphates discussed in the brief referred to are of the *ortho* class and none of the statements contained therein has any bearing on phosphates of the pyro class. The investigation which has been and is being conducted by the Tariff Commission into the foreign and domestic costs of sodium phosphates, has been limited entirely to phosphates of the *ortho* class, viz, *monosodium phosphate*, *disodium phosphate*, and *trisodium phosphate*.

The sodium pyro phosphates are dutiable under paragraph 5 * * * and the object of the recommendation now submitted is to keep unchanged the present classification for sodium pyro phosphates, which brings them under paragraph 5. * * * [Italics ours.]

The only exclusion made by Congress at the time of the enactment of the relevant paragraph of the tariff act was with respect to sodium "pyro" phosphate. As disclosed by the legislative history of the paragraph in question, *supra*, Congress, in making provision for sodium phosphate, had reference to three kinds of sodium phosphates as then known in commerce, namely, monosodium, disodium, and trisodium phosphate, all made from the same raw material, phosphoric acid, and each having its distinct uses (Summary of Tariff Information, 1929).

The Government's witness Van Wazer admitted that the term "sodium phosphate" is generally understood to include the entire family of sodium phosphates, including the "modern additions" (R. 91), although he testified that, from a chemical viewpoint, the word "sodium phosphate" means sodium orthophosphates. This limitation by the Government's witness is not in accord with his own expression on the subject of phosphoric acids and phosphates in the Encyclopedia of Chemical Technology, Kirk & Othmer, 1956 edition, volume 10, where, at page 404, the witness defines the (sodium) phosphates as "those phosphorus compounds in the anions of which each atom of phosphorus is surrounded by four oxygen atoms arranged at the corners of a tetrahedron," and then states that the *"ratio* (R) of cationic oxides (* * *) to anionic oxides ($P_2O_5$) determines the *type* of the phosphate." [Italics ours.] In the same publication, at page 438, Dr. Van Wazer states the following: "The newest member of the family of important sodium phosphates is sodium tripolyphosphate, which today enjoys larger sales than any of them," thus confirming, in our opinion, that sodium phosphate is a generic description of a

large number of manufactured materials. Tariff acts are written in the language of commerce and not in terms of science. *Hummel Chemical Co.* v. *United States*, 29 C.C.P.A. (Customs) 178, C.A.D. 189. Within the common understanding, therefore, it appears that the term "sodium phosphate" includes sodium phosphates of all types or classes.

The contention of the defendant that the merchandise at bar is classifiable under paragraph 5 of the act as a chemical compound is not supported by the record in this case. A chemical compound is a distinct substance formed by the union of two or more ingredients in definite proportions by weight. *United States* v. *Shell Oil Co., Inc.* and *A. W. Salter & Co., Inc.*, 44 C.C.P.A. (Customs) 54, C.A.D. 637. We find no such situation with respect to the production of the imported material. While it is true that a chemical reaction takes place in the process effecting the merchandise, the record establishes, in our opinion, that the merchandise in question results from a mere association of materials, the end product having the characteristics of a sodium phosphate, and not being a chemical compound in the tariff sense. Further, in our opinion, the merchandise herein is not a "mixture" of chemicals, as also contended by the defendant, which would render the product classifiable under paragraph 5 of the tariff act. In the *Shell Oil* case, *supra*, the court held that the term "mixture" in paragraph 5 of the Tariff Act of 1930 is limited to an association of materials produced by an actual mixing operation, as distinguished from one in which the materials are found together in nature or are jointly produced by some artificial process other than actual mixing. We find the principle of the *Shell Oil* case, as enunciated, *supra*, applicable herein. While the Government's witness Van Wazer testified that the product at bar "is a result of a deliberate control, pre-determined manufacturing process designed to produce that particular conglomeration of materials" (R. 92), yet the record in this case discloses that there was no intentional mixture of sodium phosphates in producing the imported merchandise, and that phosphoric acid and soda ash were the only materials used, and that nothing was added or mixed with the product obtained from the reaction (R. 27–29).

The provision for sodium phosphate in paragraph 81 of the tariff act is an *eo nomine* designation (R. 66). It is well-settled law that an *eo nomine* statutory designation of an article, without limitations or a shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and without proof of commercial designation, will include all forms of the article. *United States* v. *Page N. Goffigon*, 43 C.C.P.A. (Customs) 172, C.A.D. 625. While the legislative background of the paragraph in question would appear

to indicate that, at the time of enactment of paragraph 81 of the act, Congress, in providing for "sodium phosphate," made reference only to monosodium, disodium, and trisodium phosphates, it does not necessarily follow that those types of sodium are the only kinds of sodium phosphates contemplated under the law. It is well established that tariff acts are made for the future as well as the present and are intended to embrace new articles as they are developed. *C. J. Tower & Sons* v. *United States*, 47 C.C.P.A. (Customs) 85, C.A.D. 734. In the case of *Chicago Mica Co. et al.* v. *United States*, 21 C.C.P.A. (Customs) 401, T.D. 46927, the merchandise consisted of certain screened scrap mica which, it appeared, had no practical use or value at the time of the relevant Tariff Act of 1922, and which was consigned mostly to scrap heaps. Subsequently, a machine was developed rendering the mica suitable for commercial use. In holding the merchandise properly classifiable under paragraph 208 of the Tariff Act of 1922 as mica, unmanufactured, rather than dutiable under paragraph 1457 of said act as waste, our appellate court, page 405, stated:

* * * because it would seem, * * * that when, as here, an article which actually existed, though but little availed of, becomes available by reason of processes developed for its utilization, it certainly should be held to be embraced within the paragraph where *eo nomine* designated.

In our opinion, a comparable situation exists in the case at bar as that which existed in the *Chicago Mica Co.* case, *supra*. Here, the product at bar, while not specifically within the contemplation of Congress at the time of the enactment of the tariff paragraph covering the alleged proper classification of the material, acquired the characteristics of a sodium phosphate by reason of new developments and new methods of identification in the industry. It is thus embraced within the term "sodium phosphate" as though Congress had more specifically provided for it by name. Likewise, there is here no question of commercial designation at issue.

The Government, in its brief, directs our attention to the case of *Davies Turner & Co.* v. *United States*, 45 C.C.P.A. (Customs) 39, C.A.D. 669, involving certain furniture made by a particular process involving bending. In holding that the merchandise in question was not within the tariff meaning of the provision for "bent-wood" furniture in paragraph 412 of the Tariff Act of 1930, our appellate court concluded that "bent-wood" furniture meant, at the time of the enactment of the tariff act, only furniture made by a process of bending other than that involved therein and that furniture made by a new process as disclosed in that case was not embraced under the designation "bent-wood" furniture. However, the situation in that case is not present in the case at bar. Here, it is not merely a question whether the

classification of the merchandise has been affected by a new process but the question is whether the imported material itself is a sodium phosphate, having the characteristics as such.

In view of our finding that the imported product is specifically provided for under the provisions of paragraph 81 of the Tariff Act of 1930 as a sodium phosphate, defendant's contention that the involved merchandise is classifiable under paragraph 1558 of the tariff act as a nonenumerated manufactured article is, in our opinion, without merit.

For all of the reasons stated aforesaid, we are of opinion that the merchandise at bar is properly classifiable under paragraph 81 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, at the rate of one-half of 1 cent per pound under the provision therein for "Sodium phosphate (except pyro phosphate) : Containing by weight under 45% of water," as claimed.

The protest herein is sustained with respect to the merchandise covered by entry 934516. As to all other merchandise and all other claims, the protest is overruled. Judgment will be entered accordingly.